IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
June 24, 2003 Session

## STATE OF TENNESSEE v. CHETT ALLEN WALKER

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 236428     Stephen M. Bevil, Judge**

_____

**No. E2002-03093-CCA-R3-CD**
**October 2, 2003**
_____

The Defendant, Chett Allen Walker, was indicted for first degree premeditated murder, setting fire to personal property, and abuse of a corpse. Prior to trial, the Defendant expressed his intent to plead guilty to setting fire to personal property and abuse of a corpse, which he did. However, the trial court submitted those charges to the jury, along with the charge of first degree murder, to which the Defendant pled not guilty. Following the jury trial, the Defendant was convicted of all three charges. In this direct appeal, the Defendant raises six issues: (1) whether the trial court erred by denying the Defendant's motion to suppress his confession; (2) whether the trial court erred by allowing the charges of setting fire to personal property and abuse of a corpse to be determined by the jury after the Defendant expressed his desire to plead guilty to those charges; (3) whether the trial court erred by allowing the jury to view certain photographs and the car that the Defendant burned; (4) whether the trial court erred by allowing the prosecutor to display a photograph of the remains of the victim to the jury during his closing argument; (5) whether the trial court erred by denying the Defendant's motion with respect to the jury instructions; and (6) whether the evidence is legally sufficient to support the Defendant's conviction for first degree premeditated murder. Finding no reversible error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA MCGEE OGLE, J., joined.

Bryan H. Hoss, Chattanooga, Tennessee, for the appellant, Chett Allen Walker.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; and Bill Cox, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On Friday, February 9, 2001, the victim, Joshua Swafford, called Robert Lewis and asked to borrow his Smith and Wesson nine millimeter handgun. Although Mr. Swafford owed Mr. Lewis approximately two hundred dollars, Mr. Lewis allowed him to borrow the weapon. Mr. Lewis testified that the gun was not loaded when Mr. Swafford picked it up; however, it was capable of holding sixteen bullets. Later that evening, Mr. Swafford drove to the Defendant's house. The Defendant testified that he and Mr. Swafford had been friends when they were younger, but it had been a long time since they had seen one another. Mr. Swafford showed the Defendant the pistol that he had borrowed from Mr. Lewis, and they decided to go to a nearby water tower to shoot the gun. They proceeded to the water tower, where they each shot the gun a few times.

After they returned to the Defendant's house, the Defendant's cousin, Barry Dent, arrived at the residence. The men were discussing their plans for the evening, and the conversation turned to smoking marijuana. Mr. Swafford asked the Defendant how much money he had, and the Defendant responded that he had one thousand, seven hundred dollars. For this amount of money, Mr. Swafford stated that he could acquire two pounds of marijuana. Mr. Dent asked Mr. Swafford whether he could obtain ecstacy, and Mr. Swafford said he could.

The Defendant, Mr. Swafford, and Mr. Dent went to an establishment called the Read House in order to procure the drugs. Mr. Swafford went inside the building to buy some ecstacy while the Defendant and Mr. Dent waited outside in Mr. Swafford's car. When Mr. Swafford returned with the drugs, he and Mr. Dent got into an argument regarding the price of the drugs or the quantity of drugs he received. Mr. Swafford said, "Well, if you don't think it's right, you know, I'll stick the gun to your head, too." The Defendant was able to calm the other two men down, and they left to go to a house in Hixson to purchase marijuana. When they arrived at the house in Hixson, the Defendant got out of the car. As he was coming around the front of the car, Mr. Swafford pulled out the handgun, stuck it to the Defendant's head, and said, "Look, I got your money, but you're just going to take it like a bitch, man, just deal with it." The Defendant testified that he was scared and believed Mr. Swafford was serious.

After this altercation, the Defendant and Mr. Swafford went inside the house. They went to a back bedroom, where they encountered a young man and a young woman. Mr. Swafford and the young man went into an adjoining bathroom, where, according to the Defendant, they talked about him. After approximately five minutes, the Defendant, Mr. Swafford, and Mr. Dent left the house in Hixson. The Defendant did not receive any marijuana, and Mr. Swafford did not give him back his money. Mr. Swafford drove, Mr. Dent sat in the front passenger seat, and the Defendant sat in the back seat. As they were leaving, Mr. Swafford placed the nine millimeter handgun under the front seat of the car. The Defendant leaned down and grabbed the gun.

When the three men arrived back at the Defendant's house, Mr. Dent got out of the car, and the Defendant took his place in the front seat. He told Mr. Swafford to drive down the road, which

Mr. Swafford did. When the Defendant had Mr. Swafford stop the car, the Defendant demanded that his money be returned. The Defendant testified that he was "scared" and that he just wanted to get his money back. The Defendant took the pistol he had taken from under the seat of the car and shot it once out the window of the car, then he shot Mr. Swafford. Two gunshot wounds were found on the victim's body.

After he shot the victim, the Defendant drove the car back to his driveway, where he sat for approximately two hours. He then took gasoline from his four-wheeler and drove the car to a field behind his house. He poured the gasoline in the driver's seat of the car and set it on fire with the victim's body inside. The Defendant then went home and went to sleep.

On the following Sunday morning, February 11, the Defendant got up and told his mother's boyfriend, Gary Arnold, that he wanted to go outside and see the new transmission that Mr. Arnold was going to install in his truck. When they got outside, the Defendant directed Mr. Arnold's attention to the burned car. He and Mr. Arnold walked to the car, and Mr. Arnold peered inside. He observed scorched skeletal remains in the car, so he ran back to the house and called 911. Shortly thereafter, the police came.

Police officers took several people, including the Defendant, to the sheriff's annex to be interviewed regarding possible information they had relating to the burned body and car. Detective Robert Starnes interviewed the Defendant. Initially, the Defendant denied having any knowledge of the crime. However, later in the same interview, the Defendant told Detective Starnes that his cousin, Barry Dent, had confessed to shooting the victim four times, and that he was willing to assist the officers by obtaining a confession from Mr. Dent.

Accepting the Defendant's offer to help coax a confession from Mr. Dent, the police officers placed the Defendant in a holding cell next to Mr. Dent's cell. Despite the Defendant's efforts to convince Mr. Dent that he had killed the victim, Mr. Dent did not confess. The next morning, February 12, 2001, after spending the night in the holding cell, the Defendant indicated that he wanted to speak to Detective Starnes. In the first statement he gave to Detective Starnes that morning the Defendant described how the victim had taken one thousand, seven hundred dollars from him. He explained how he and the victim had gone to the water tower to shoot the gun. He also told them that he had procured the gun while he was riding in the back seat of the victim's car. He confessed that he had the victim drive down the road beside his house and that he shot the victim there. After he shot the victim, he moved him to the passenger side of the vehicle. The Defendant explained how he sat in his driveway for two hours with the dead body of the victim in the seat next to him. He told the officers that he had used kerosene to set the car on fire to destroy any fingerprints. He also said that he painted the nine millimeter pistol black and threw it over the dam into the river early on the Saturday morning after the crime. The Defendant also bought new shoes at Wal-Mart on Saturday. He disposed of his old shoes and the spray paint that he used to paint the gun in a dumpster next to a car wash. Finally, the Defendant agreed to take the officers and show them where the events had taken place.

The Defendant was more calm and less emotional in the second statement he gave on the morning of February 12. He recounted the victim coming to his house and showing him the nine millimeter Smith and Wesson pistol on the evening of February 9. He explained that he, the victim, and Barry Dent went to the Read House to obtain ecstasy, and they were going to get marijuana in Hixson. The Defendant described the argument between the victim and Mr. Dent regarding the ecstasy. He told the police that he gave the victim one thousand, seven hundred dollars in exchange for two pounds of marijuana, but he never received the drugs. The victim "put that gun in [the Defendant's] face and he said 'take it like a bitch.'" On the way back to the Defendant's house, the Defendant reached under the driver's seat and grabbed the gun. The Defendant had the victim drive down the road, and he demanded the victim return his money. The Defendant told the police officers that the victim said, "[N]aw, I ain't got that money." The Defendant then fired a shot out the window of the vehicle "just to make sure it would go off," then he shot the victim approximately three times. The Defendant explained how he moved the victim, who was gasping, to the passenger seat, and then drove back to his house. After sitting in the driveway for approximately two hours, he retrieved gasoline from his four-wheeler, drove the car to a field behind his house, poured the gas on the car, and set it on fire. The next day, the Defendant went to Wal-Mart to buy new shoes. He threw his old shoes in a garbage can at the car wash next to Wal-Mart "[t]o hide the tracks." The Defendant painted the handgun black and threw it over the Chickamauga Dam.

The Defendant took the officers to the water tower where he and the victim had fired the weapon. The officers collected twelve spent shell casings at the water tower. The Defendant also took the officers to the car wash next to Wal-Mart where he disposed of the shoes he wore on the night he killed the victim. The shoes were recovered from a trash receptacle. The Defendant showed the officers the actual location where he shot the victim and where he burned the car. Finally, the Defendant took the officers to the Chickamauga Dam and showed them where he threw the gun into the Tennessee River. Although police divers searched for the weapon, they were unable to locate it.

**ADMISSIBILITY OF CONFESSION**

The first issue raised by the Defendant is whether the trial court erred by denying the motion to suppress his confession. The Defendant filed a pretrial motion to suppress the statements he made to the police, which the trial court denied. The Defendant's confessions were subsequently admitted into evidence at trial. On appeal, a trial court's ruling on a motion to suppress may be overturned only if the evidence in the record preponderates against the trial court's findings. See State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998). Moreover, "the party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Questions of witness credibility, the weight of the evidence, and the resolution of conflicts in the evidence are matters entrusted to the trial court. See id. This Court is not, however, bound by the trial court's conclusions of law. See State v. Simpson, 968 S.W.2d 776, 779 (Tenn. 1998). In evaluating the correctness of the trial court's ruling on the Defendant's motion to suppress, we may consider the proof adduced both at the suppression hearing and at trial. See Henning, 975 S.W.2d at 299.

At the suppression hearing, Detective Robert Starnes testified that, after the victim's burned body was found in a car behind the Defendant's house, approximately nine people, including the Defendant, were taken to the police station to be interviewed. The Defendant rode to the police station in the front seat of a police car. Detective Starnes said that the purpose for taking all these people to the police annex was to discover what possible information they had concerning the crime. Although Detective Starnes did not personally interview every person that was brought down to the station, he did interview the Defendant, and that interview began at approximately 8:32 p.m. on the night of February 11, 2001 and lasted thirty to forty minutes.[1] Prior to this interview, Detective Starnes read the Defendant his Miranda rights, and the Defendant executed a rights waiver form at 8:17 p.m. In this first statement, the Defendant told the police that his cousin, Barry Dent, had admitted that he killed the victim. Detective Starnes testified that the Defendant then volunteered to assist the police officers by attempting to get Mr. Dent to confess to the killing. Therefore, the police placed the Defendant in a cell that adjoined Mr. Dent's cell and installed a listening device in the ceiling above the cells. Although the Defendant repeatedly tried to convince Mr. Dent that he had confessed to shooting the victim four times, he was unable to elicit a confession from Mr. Dent. According to the suppression hearing testimony of Mr. Dent, he and the Defendant were in the holding cells between two and four hours.[2]

The next morning, approximately thirteen hours after his first interview, the Defendant requested to speak with Detective Starnes. In this second interview, the Defendant confessed to the killing of the Defendant. After the interview, the Defendant took the officers to the crime scene and helped them collect evidence. When they returned, the officers took another statement from the Defendant after reminding him of the rights that were explained to him the night before.

At the conclusion of the suppression hearing, the trial court ruled that the Defendant had not been seized by the police at the time of his confession. The trial court found that the Defendant had been willing to help the police throughout the time he was at the police annex; he did nothing against his will. He volunteered to attempt to coax a confession out of Mr. Dent, and he was placed in a holding cell next to Mr. Dent's in order for him to do so. While he was at the police station, the Defendant was given food and water. On the morning of February 12, the Defendant initiated a request to speak with Detective Starnes, at which time he confessed to the murder of Joshua Swafford. The trial court opined that the situation would have been different had the police officers approached the Defendant the next morning. The trial court ruled that the Defendant's confession was not the product of an illegal seizure, and the absence of fresh Miranda warnings on the morning of February 12 did not render the confession involuntary.

Our first task is to determine whether the Defendant was "seized" within the meaning of the Fourth Amendment at the time he confessed to the crime. Whenever an officer accosts an individual

---

[1]Apparently there was a clerical error regarding the time that the Defendant's first interview began, but Detective Starnes made it clear in his testimony that the interview began at 8:32 p.m.

[2]The Defendant did not testify at the suppression hearing.

and restrains his or her freedom to walk away, the officer has "seized" that person for Fourth Amendment purposes. See State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting Terry v. Ohio, 392 U.S. 1, 16, 88 S. Ct. 1868, 1877, 20 L. Ed. 2d 889 (1968)). In this case, there are circumstances which tend to indicate that the Defendant was seized by the police. For example, he was escorted to the police annex in a police car, albeit in the front seat. Several of the witnesses at the suppression hearing, who, like the Defendant, were taken to the police annex, testified that they did not feel as though they had a choice in the matter, and once they were at the police station, they did not feel free to leave. Finally, the Defendant was placed in a holding cell for two to four hours until he indicated he wanted to speak with Detective Starnes.[3]

Although these factors weigh in favor of finding that the Defendant was seized by the police at the time of his confession, the Defendant's trial testimony indicates that he was not. The Defendant testified at trial that he voluntarily went to the police station on February 11. Although he went to the station in a police car, he was acting pursuant to his own free will. Detective Starnes testified, and the Defendant agreed, that it was the Defendant who volunteered to talk to Barry Dent in an attempt to obtain a confession from him. Therefore, it was the Defendant's choice to spend between two and four hours in a holding cell talking to Mr. Dent. When his lawyer asked him why he wanted to talk to Detective Starnes on the morning of February 12, he replied, "He was just so nice, man, I guess I just figured he'd understand, you know what I mean? I could see it in his eyes, man. I told him, 'Man, just listen to me, man.' I just knew he would understand." Given the Defendant's testimony that (1) he went to the police station voluntarily, (2) he went to the holding cell to talk to Mr. Dent of his own accord, and (3) he wanted to speak with Detective Starnes because he believed the Detective would understand, we agree with the trial court's determination that the Defendant was not "seized" for Fourth Amendment purposes at the time of his confession. Even if the Defendant were illegally seized by the police, that is, held against his will without probable cause, we believe that his confession "was sufficiently an act of free will to purge the taint of the unlawful invasion." Wong Sun v. U.S., 371 U.S. 471, 486, 83 S. Ct. 407, 416-17, 9 L. Ed. 2d 441 (1963). Therefore, the Defendant's argument that his confession was the product of an illegal seizure is without merit.

The Defendant also contends that his confession should have been suppressed because the police failed to re-administer the Miranda warnings before the Defendant's second statement. As our supreme court has observed, "police officers are only obligated to administer Miranda warnings prior to 'custodial interrogation' which has been defined as a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" State v. Bush, 942 S.W.2d 489, 499 (Tenn. 1997) (quoting Stansbury v. California, 511 U.S. 318, 323, 114 S. Ct. 1526, 1529, 128 L. Ed. 293 (1994)). "[T]he appropriate inquiry in determining whether an individual is 'in custody' and entitled to Miranda warnings is whether, under the totality of the circumstances, a reasonable person

---

[3]We note that, from the time that the police first began their investigation to the time that the Defendant expressed his desire to speak with Detective Starnes on the morning of February 12, the police were without probable cause to place the Defendant under arrest.

in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996).

As we have already stated, the facts that the Defendant was escorted to the police station in a police car and spent part of the evening in a holding cell would usually indicate that the person was in custody. However, in this case, the Defendant testified at trial that he went to the police annex of his own free will, and he volunteered to go to the holding cell to attempt to convince Mr. Dent to confess to the murder. In light of the Defendant's testimony, we are of the opinion that he was not in custody.

Nevertheless, Detective Starnes administered the Miranda warnings to the Defendant and had him sign a rights waiver form on the evening of February 11, 2001, before the Defendant's first statement to the police. The police did not re-issue Miranda warnings prior to the Defendant's confession on the morning of February 12. However, Detective Starnes reminded the Defendant of his constitutional rights prior to the Defendant's second confession on February 12 and made certain that the Defendant was willing to speak with the officers.

In support of his argument that the Defendant's confession should have been excluded at trial because of the police officers' failure to re-administer Miranda warnings to the Defendant on the morning of February 12, the Defendant relies upon the statement by our supreme court that "a contemporaneous warning is thus absolutely necessary to the subsequent admissibility of a statement . . . ." State v. Crump, 834 S.W.2d 265, 270 n.3 (Tenn. 1992). In that case, however, the defendant, who was arrested after he escaped from a work detail, invoked his right to remain silent but was further interrogated while two detectives drove him around his escape route. This case is distinguishable in that the Defendant never invoked his right to remain silent. Rather, it was the Defendant who approached the police officers on the morning of February 12. Furthermore, there is no evidence that would indicate that the Defendant's confession was not knowingly and voluntarily given. As we have already stated, when he was asked at trial why he had confessed to Detective Starnes, the Defendant answered, "He was just so nice, man, I guess I just figured he'd understand, you know what I mean? I could see it in his eyes, man. I told him, 'Man, just listen to me, man.' I just knew he would understand." We agree with the trial court that the failure of the police to re-administer Miranda warnings to the Defendant on the morning of February 12 should not render the confession inadmissible. This issue is without merit.

### TRIAL COURT'S REJECTION OF GUILTY PLEAS

The Defendant contends that it was error for the trial court to allow the charges of setting fire to personal property and abuse of a corpse to be determined by the jury even though the Defendant expressed his desire to plead guilty to those charges. "The right to plead not guilty has inherently and constitutionally within it the right to plead guilty." Lawrence v. State, 455 S.W.2d 650, 651 (Tenn. Crim. App. 1970). When a defendant chooses to plead guilty, "the plea must be voluntarily, understandingly, and knowingly entered to pass constitutional muster." Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998) (citing Boykin v. Alabama, 395 U.S. 238, 244, 89 S. Ct. 1709,

1713, 23 L. Ed. 274 (1969)).  Additionally, in Tennessee, before entering a judgment on the plea, the trial court must be satisfied that there is a factual basis for the plea.  See Tenn. R. Crim. P. 11(f).

The Defendant correctly notes that there is no absolute right to plead guilty.  See State v. Williams, 851 S.W.2d 828, 830 (Tenn. Crim. App. 1992).  "When a defendant challenges the court's failure to accept a plea, our obligation as an appellate court is to determine if an abuse of discretion occurred."  VanArsdall v. State, 919 S.W.2d 626, 630 (Tenn. Crim. App. 1995).  If no substantial evidence exists to support the decision of the trial court, an abuse of discretion will be found.  See Williams, 851 S.W.2d at 830.

In this case, the trial court, without conducting a voir dire of the Defendant to determine whether his plea was knowing and voluntary, decided to submit the charges to the jury in spite of the Defendant's guilty pleas because all of the charges were included in one indictment, as they all arose out of the same criminal episode.  It is our opinion that the trial court's decision does not constitute an abuse of its discretion.[4]  Moreover, even if the trial court did abuse its discretion by refusing to accept the Defendant's guilty pleas, it is difficult to conceive how such an error could have prejudiced the Defendant, as he was found guilty by the jury of the charges to which he intended to plead and the evidence of the other crimes would have been admissible in the trial for the first degree murder charge.  Therefore, this issue is without merit.

### ADMISSIBILITY OF PHOTOGRAPHS AND JURY VIEW OF CAR

Next, the Defendant argues that the trial court erred by allowing the jury to view certain photographs and the car that the Defendant burned.  He contends that the probative value of this evidence was outweighed by the risk of unfair prejudice.  See Tenn. R. Evid. 403.  "The decision to admit the photographs lies in the discretion of the trial court and will not be reversed absent a clear showing of an abuse of that discretion."  State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992); see also State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); State v. Dickerson, 895 S.W.2d 90, 92 (Tenn. Crim. App. 1993).

The challenged photographs depict the thoroughly charred interior of an automobile.  Also depicted in the photos are the scorched remains of the victim.  The remains of the body are so completely burned that they are difficult to identify.  However, portions of the skeleton are recognizable in each photo, specifically part of the rib cage.

The Defendant maintains that the photos are so gruesome that their prejudicial effect outweighs any probative value they might possess.  First of all, the photographs do have probative

---

[4]In State v. Hall, 958 S.W.2d 679 (Tenn. 1997), the defendant was charged with first degree murder, felony murder, and aggravated arson.  He pled guilty to arson and felony murder.  The trial court refused to accept those guilty pleas.  The defendant maintained his guilt of those crimes throughout the trial, contesting only the charge that the killing was premeditated and deliberate.  Our supreme court affirmed the jury's verdicts of guilt on the aggravated assault and first degree murder charges.  Although the court was not presented with the issue of whether the trial court erred by refusing to accept the defendant's guilty pleas, the court in no way indicates that such action on the part of the trial court would constitute error.  See id. at 686 n.5.

value. Most importantly, the photographs illustrate the extent of the damage done to the victim's body and the car in which he was sitting. Destruction of the evidence of the murder is one factor from which a jury can determine that a killing was done with premeditation. See State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000). Therefore the photographs are probative on the issue of premeditation.

Furthermore, we do not find that the photographs presented a significant danger of unfair prejudice to the Defendant. The photos are not especially gruesome. Although a few bones are visible, the majority of the remains of the body are not readily identifiable. The fire burned most of the body and the interior of the vehicle beyond recognition. The Defendant contends that the photographs should have been excluded because he admitted that he burned the car and the body, and other witnesses, including a detective and a medical examiner, testified to the location, position, and condition of the body. However, the fact that the photographs constituted evidence that was cumulative to the testimony of various witnesses does not render the photographs per se inadmissible under Tennessee Rule of Evidence 403. Accordingly, the trial court did not abuse its discretion by allowing the jury to view the photographs in question, and this issue is without merit.

The Defendant also complains that the trial court erred by allowing the jury to view the burned car. Whether to allow the jury to view evidence outside the courtroom is an issue that addresses itself to the discretion of the trial court, see Boyd v. State, 475 S.W.2d 213, 222 (Tenn. Crim. App. 1971), and we will not reverse a trial court's decision absent an abuse of that discretion. In this case, we find no abuse of discretion. The burned car was relevant to show the extent to which the Defendant attempted to conceal the evidence of the homicide. The jury had already been exposed to photographs of the car; therefore the possibility of unfair prejudice resulting from the jury viewing the actual car as opposed to merely the photographs was very low. This issue is without merit.

## STATE'S CLOSING ARGUMENT

The Defendant argues that he was prejudiced by the State's closing argument when the prosecutor held up one of the pictures depicting the charred remains of the victim and said, "That's Josh Swafford." The prosecutor then pointed to the Defendant and said,

> That's Chet Walker. Why did this happen to Chet Walker? Because he took a gun, fired it once to make sure it worked, turned and faced his friend and fired into his chest until there were no more bullets. That is why he is here and that is why Josh Swafford is not here and his family will never see him again.

Defense counsel failed to object to the prosecutor's statements or his use of the photograph during closing argument. By failing to register a contemporaneous objection, the Defendant has waived this issue. See Tenn. R. App. P. 36(a); State v. Dellinger, 79 S.W.3d 458, 495 (Tenn. 2002). Furthermore, we have already determined that the trial court did not err by admitting the photograph used by the prosecutor during his closing argument, and we find no plain error with respect to the prosecutor's comments.

**JURY INSTRUCTIONS**

The Defendant asserts that the trial court improperly instructed the jury regarding the burden of proof. "[A] defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). This Court is obligated to "review the entire charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994).

The Defendant contends that the jury instruction was deficient for three reasons. First, the trial court did not instruct the jury that the State had the burden of proving the Defendant's guilt to a "moral certainty" as set forth in Tennessee Pattern Jury Instruction 2.03. The trial court gave the following instruction regarding reasonable doubt:

> The defendant is not required to prove his innocence or to do anything. Every crime is made up of parts called elements. The state must prove each element of the crime beyond a reasonable doubt. If you find that the state has not proven every element beyond a reasonable doubt, then you must find the defendant not guilty.
>
> A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in the case. It is not necessary that the defendant's guilt be proved beyond all possible doubt, as absolute certainty of guilt is not demanded by the law to convict of any criminal charge.
>
> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of guilt.
>
> The United States Supreme Court has stated that
> [s]o long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Rather, taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury.

Victor v. Nebraska, 511 U.S. 1, 5, 114 S. Ct. 1239, 1243, 127 L. Ed. 2d 583 (1994); see also State v. West, 844 S.W.2d 144, 151 (Tenn. 1992) (holding that "[t]here is no requirement limiting a trial court to the use of 'pattern instructions'").

The Defendant cites State v. Derek Denton, in which a panel of this Court cautioned against using a jury instruction that "does not adequately convey the evidentiary certainty required under the reasonable doubt standard," and recommended using Tennessee Pattern Jury Instruction 2.03. No. 02C01-9409-CR-00186, 1996 WL 432338, at *9 (Tenn. Crim. App., Jackson, Aug. 2, 1996).

-10-

However, in that case, this Court ultimately concluded that it was not error for the trial court to refuse to include the "moral certainty" language in its charge. See id. at *8. Furthermore, this Court has recently held that no due process violation arose from using the term "reasonable certainty" as opposed to "moral certainty." See State v. Leroy Nevils, No. M2002-00411-CCA-R3-CD, 2003 WL 1787294, at *7 (Tenn. Crim. App., Nashville, April 4, 2003).

Consistent with our opinions in Denton and Nevils, we find that the trial court's refusal to include the "moral certainty" language in its reasonable doubt instruction did not constitute error. Taken as a whole, the trial court's instruction correctly conveyed the concept of reasonable doubt to the jury. See Victor, 511 U.S. at 5. Accordingly, this issue is without merit.

Next, the Defendant argues that it was error for the trial court to fail to inform the jury that the "burden [of proof] never shifts but remains on the state throughout the trial of the case." T.P.I.-Crim. 2.02. Regarding the burden of proof, the trial court instructed the jury as follows:

> A person accused of a crime is presumed to be innocent. This means that you must start with the presumption that the defendant is innocent. This presumption continues throughout the trial and entitles the defendant to a verdict of not guilty unless you are satisfied beyond a reasonable doubt that he is guilty.
>
> The defendant is not required to prove his innocence or to do anything. Every crime is made up of parts called elements. The state must prove each element of the crime beyond a reasonable doubt. If you find that the state has not proven every element beyond a reasonable doubt, then you must find the defendant not guilty.

It is our opinion that this instruction, taken as a whole, correctly conveyed to the jury the notion that the State bears the burden of proof in a criminal trial. This issue is without merit.

Finally, the Defendant contends that the trial court erred by not re-reading after closing arguments the portions of the jury charge that defined reasonable doubt and the State's burden of proof. The judge simply reminded the jury of those portions of the charge, which he read to them prior to testimony being given, and told the jurors to re-read them as they deliberated. The State correctly points out in its brief that this Court addressed this issue in State v. Anderson Toliver, No. E2001-00584-CCA-R3-CD, 2001 WL 1613876, at *28 (Tenn. Crim. App., Knoxville, Dec. 18, 2001). In that case, the trial judge gave a portion of the charge to the jury prior to the trial. However, the judge refused to repeat those instructions at the conclusion of the proof.

Tennessee Rule of Criminal Procedure 30(a) states, in pertinent part, "the court shall instruct the jury after the arguments are completed."[5] In Toliver, a panel of this Court determined that it was

---

[5]Effective July 1, 2003, the quoted language above from Rule 30(a) was omitted and replaced by new Rule 30(d)(2). New Rule 30(d) states in its entirety,

(continued...)

-11-

error for the trial judge to present a portion of the jury instructions only before the proof had been presented. Judge Alan Glenn specifically wrote that, under Rule 30, "no discretion is given to the trial court as to when, in the trial, instructions are to be given to the jury; the jury is to be instructed after the completion of the final arguments." Id. at *29. Consistent with Toliver, we agree with the Defendant that it was error under Rule 30 for the trial judge to refuse to repeat the instructions on the burden of proof and reasonable doubt after closing arguments.

However, in Toliver, the trial judge's error was deemed harmless because the instructions given to the jury were correct and adequate, the jury was given a complete copy of the written instructions at the conclusion of the trial, and there was no evidence that the "sequential giving of instructions affected [the trial's] outcome." Id. Likewise, in this case, we have determined that the charge given to the jury, particularly the instructions defining reasonable doubt and stating that the State bears the burden of proof, was sufficient. The jury was provided a copy of the instructions, and the trial judge encouraged the jurors to re-read the portion of the instructions that he gave them prior to trial. Accordingly, we conclude that the trial judge's error in giving sequential instructions was harmless because we cannot say that the error affected the outcome of the trial. See Tenn. R. Crim. P. 52(a).

## SUFFICIENCY OF THE EVIDENCE

Finally, the Defendant asserts that the evidence presented at trial was insufficient to support his conviction for first degree murder. Specifically, the Defendant argues that the evidence did not establish that the murder was committed with premeditation. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. See McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Buggs, 995 S.W.2d 102, 105-06 (Tenn. 1999); State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

---

[5](...continued)

      Timing of Jury Instructions. — (1) At beginning of trial. — Immediately after the jury is sworn, the court shall instruct the jury concerning its duties, its conduct, the order of proceedings, the general nature of the case, and the elementary legal principles that will govern the proceeding.

      (2) Before and After Closing Argument. — Jury instructions on the applicable law may be given before or after closing argument, in the court's discretion. All or part of such instructions given before closing argument may be repeated after closing argument. Additional instructions concerning organizational and related matters also may be given after closing argument.

Obviously, new Rule 30(d) bestows greater discretion upon trial courts regarding when instructions may be given to the jury. However, as the new rule did not take effect until July 1, 2003, and this case was tried in July of 2002, we are bound to review this issue under the language of old Rule 30(a).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914; see also Smith, 24 S.W.3d at 279. The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191; see also Buggs, 995 S.W.2d at 105. Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. See Tuggle, 639 S.W.2d at 914. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. See State v. Morris, 24 S.W.3d 788, 795 (Tenn. 2000); State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

Our criminal code defines premeditation as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d). A jury may infer premeditation from the manner and circumstances of the killing. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). There are several factors that tend to support the existence of premeditation, which include: evidence of procurement of a weapon; the use of a deadly weapon upon an unarmed victim; infliction of multiple wounds; destruction of evidence of the murder; and failure to render aid to the victim. See State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Fugate, 776 S.W.2d 541, 545 (Tenn. Crim. App. 1988).

Viewing the evidence and inferences therefrom in the light most favorable to the State, we find sufficient evidence to support the jury's finding of premeditation. The evidence showed that the Defendant grabbed the gun from under the driver's seat of the victim's car while they were driving back to the Defendant's house. The Defendant admitted to firing the gun once out the window to ensure that it functioned properly; then he shot the victim, who was unarmed, at least two times. Not only did the Defendant not render aid to the victim, he sat in his driveway for approximately two hours while the victim died. Then the Defendant burned the body and the car in an attempt to destroy the evidence. Each of these factors is relevant to the issue of premeditation. We conclude that the evidence before the jury was sufficient to support the finding of guilt of first degree premeditated murder beyond a reasonable doubt. This issue is without merit.

The judgments of the trial court are affirmed.

_____
DAVID H. WELLES, JUDGE